http://www.va.gov/vetapp16/Files4/1630506.txt

Citation Nr: 1630506 
Decision Date: 07/29/16 Archive Date: 08/04/16

DOCKET NO. 08-25 230 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Cleveland, Ohio

THE ISSUES

1. Entitlement to an initial rating in excess of 20 percent for a right shoulder disability, exclusive of a period of an assigned temporary total rating from August, 20, 2010 to November 30, 2010.

2. Entitlement to service connection for carpal tunnel syndrome (CTS) of the right wrist, to include as secondary to a service-connected right shoulder disability.

3. Entitlement to service connection for disc dissection of C6-C7 (cervical spine condition), to include as secondary to a service-connected right shoulder disability.

REPRESENTATION

Veteran represented by: The American Legion

ATTORNEY FOR THE BOARD

R. Kipper, Associate Counsel

INTRODUCTION

The Veteran served in the Army Reserves from 1983 to 2005, with various periods of active duty for training (ACDUTRA) and inactive duty for training (INACDUTRA).

These matters come before the Board of Veterans' Appeals (Board) on appeal from a June 2006 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Cleveland, Ohio. 

In May 2015, the Board remanded this case for further development.

The issue of entitlement to service connection for an acquired psychiatric disorder has been raised by the record in a June 2013 VA Form 21-4142, but has not been adjudicated by the Agency of Original Jurisdiction (AOJ). Therefore, the Board does not have jurisdiction over it, and it is referred to the AOJ for appropriate action. 38 C.F.R. § 19.9(b) (2015); see 79 Fed. Reg. 57,660 (Sept 24, 2014) (codified in 38 C.F.R. Parts 3, 19, and 20 (2015)).

The issues of entitlement to service connection for right hand CTS and a cervical spine condition are addressed in the REMAND portion of the decision below and are REMANDED to the AOJ.

FINDINGS OF FACT

1. The Veteran's service-connected right shoulder disability is not shown to have been 10 percent disabling prior to the Veteran's entry onto a period of ACDUTRA in August 2004.

2. Prior to September 9, 2014, the Veteran's right shoulder disability was manifested by limited range of motion that most nearly approximates limitation of motion to midway between side and shoulder level, even when taking into account functional limitation due to factors such as pain, weakness, and instability, but ankylosis; fibrous union, nonunion, malunion, or loss of the head of the humerus; and limitation of motion of the arm to 25 degrees from the side were not shown.

3. Since September 9, 2014, the Veteran's right shoulder disability has been manifested by limited range of motion that most nearly approximates limitation of motion to 25 degrees from the side or intermediate ankylosis, but unfavorable ankylosis and fibrous union, nonunion, malunion, or loss of the head of the humerus were not shown.

CONCLUSIONS OF LAW

1. Prior to the Veteran's entry onto a period of ACDUTRA in August 2004, the manifestations of the Veteran's right shoulder disability did not meet the criteria for a 10 percent rating so as to justify any deduction from the evaluation assigned for the service-connected right shoulder disability; therefore a rating of 30 percent is assigned since the effective date of service connection. 38 U.S.C.A. §§ 1155, 5102, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.383, 4.1, 4.2, 4.7, 4.10, 4.22, 4.71a including DC 5201 (2015).

2. Prior to September 9, 2014, the criteria for a rating in excess of 30 percent for a right shoulder disability have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.1, 4.3, 4.7, 4.10, 4.14, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5200-5203 (2015).

3. Since September 9, 2014, the criteria for a rating of 40 percent, but no higher, for a right shoulder disability have been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.1, 4.3, 4.7, 4.10, 4.14, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5200-5203 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duties to Notify and Assist

VA has a duty to notify and assist claimants in substantiating a claim for VA benefits pursuant to 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b). In September 2005, the agency of original jurisdiction (AOJ) sent a letter to the Veteran providing the notice required for the initial claim of service connection for a right shoulder disability. The notice included information concerning how ratings and effective dates are assigned. Service connection was subsequently granted for a right shoulder disability, and the Veteran appealed the assigned rating. In cases such as this, where service connection has been granted and an initial disability rating and effective date have been assigned, the typical service connection claim has been more than substantiated, it has been proven, thereby rendering 38 U.S.C.A. § 5103(a) notice no longer required because the purpose that the notice is intended to serve has been fulfilled. Dingess/Hartman v. Nicholson, 19 Vet. App. 473, 490 (2006); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). 

VA also has a duty to assist the Veteran in the development of the claim. This duty includes assisting the Veteran in the procurement of service treatment records (STRs) and pertinent treatment records and providing an examination when necessary. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159. 

Here, the record reflects that VA made reasonable efforts to obtain relevant records adequately identified by the Veteran. Specifically, the information and evidence that have been associated with the claims file include the Veteran's service treatment records, VA treatment records, private treatment records, VA examination reports, and the Veteran's lay statements. Neither the Veteran, nor his representative, has identified any outstanding evidence, to include any other medical records, which could be obtained to substantiate his appeal.

The Court has also held that VA's statutory duty to assist the Veteran includes the duty to conduct a thorough and contemporaneous examination so that the evaluation of the claimed disability will be a fully informed one. See Green v. Derwinski, 1 Vet. App. 121, 124 (1991). Where the evidence of record does not reflect the current state of the Veteran's disability, a VA examination must be conducted. Schafrath v. Derwinski, 1 Vet. App. 589 (1991); 38 C.F.R. § 3.327(a) (2015).

In this case, the Veteran was afforded VA examinations to evaluate her right shoulder disability in May 2006 and July 2011. The Board finds that the VA examinations are adequate for evaluation purposes because the examiners reviewed the claims file, considered the lay statements of the Veteran, thoroughly examined the Veteran, and addressed the relevant rating criteria, including the functional effects caused by the Veteran's right shoulder disability. See Barr v. Nicholson, 21 Vet. App. 303, 311 (2007); Stefl v. Nicholson, 21 Vet. App. 120, 124-25 (2007); Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 303-04 (2008). Additionally, in December 2015, the Veteran submitted updated Disability Benefits Questionnaires filled out by her private physicians detailing the current severity of her right shoulder disability. Therefore, the Board finds that the examinations of record are adequate to adjudicate the Veteran's claim and that no further examinations are necessary. 

The duty to assist has therefore been satisfied and there is no reasonable possibility that any further assistance to the Veteran by VA would be capable of substantiating his claim. See Soyini v. Derwinski, 1 Vet. App. 540, 546 (1991); Sabonis v. Brown, 6 Vet. App. 426, 430 (1994). 

In light of the foregoing, the Board finds that there is no further action to be undertaken to comply with the provisions of 38 U.S.C.A. § 5103(a), § 5103A, or 38 C.F.R. § 3.159, and that all necessary development has been accomplished. Therefore, appellate review may proceed without prejudice to the appellant. See Bernard v. Brown, 4 Vet. App. 384 (1993).

II. Increased Rating

Disability ratings are determined by the application of the VA's Schedule for Rating Disabilities. Separate diagnostic codes identify the various disabilities. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § Part 4 (2015). Ratings for service-connected disabilities are determined by comparing the Veteran's symptoms with criteria listed in VA's Schedule for Rating Disabilities, which is based, as far as practically can be determined, on average impairment in earning capacity. Where there is a question as to which of two disability evaluations shall be applied, the higher evaluation is to be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating is to be assigned. 38 C.F.R. § 4.7 (2015). The Veteran's entire history is reviewed when making disability evaluations. See generally 38 C.F.R. § 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1995). After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the Veteran. 38 C.F.R. § 4.3.

When evaluating disabilities of the musculoskeletal system, 38 C.F.R. § 4.40 allows for consideration of functional loss due to pain and weakness causing additional disability beyond that reflected on range of motion measurements. See DeLuca v. Brown, 8 Vet. App. 202 (1995). Further, 38 C.F.R. § 4.45 provides that consideration also be given to weakened movement, excess fatigability and incoordination.

Where, as here, the question for consideration is the propriety of the initial evaluation assigned, evaluation of the medical evidence since the grant of service connection and consideration of the appropriateness of "staged rating" is required. Fenderson v. West, 12 Vet. App. 119, 126 (1999).

In making all determinations, the Board must fully consider the lay assertions of record. A Veteran is competent to report on that of which he or she has personal knowledge. Layno v. Brown, 6 Vet. App. 465, 470 (1994). When considering whether lay evidence is competent the Board must determine, on a case by case basis, whether the Veteran's particular disability is the type of disability for which lay evidence may be competent. Kahana v. Shinseki, 24 Vet. App. 428 (2011); see also Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007). 

The Board has reviewed all of the evidence in the Veteran's claims folder. Although the Board has an obligation to provide reasons and bases supporting this decision, there is no need to discuss, in detail, the extensive evidence of record. Indeed, the Court of Appeals for the Federal Circuit has held that the Board must review the entire record, but does not have to discuss each piece of evidence. Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000). Therefore, the Board will summarize the relevant evidence where appropriate, and the Board's analysis below will focus specifically on what the evidence shows, or fails to show, as to the Veteran's claims.

A. Reduction for Preexisting Disability

In the June 2006 rating decision from which this appeal ensued, the RO granted service connection for in-service aggravation of a preexisting right shoulder condition and assigned an initial disability rating of 30 percent. However, the RO found that because the right shoulder disability was 10 percent disabling prior to service, the rating must be reduced pursuant to the provisions of 38 C.F.R. 4.22.

As an initial matter, the record shows uniformly that the Veteran entered an August 2004 period of ACDUTRA with a preexisting right shoulder condition. In this regard, an August 1994 private treatment record shows that the Veteran, who worked as a nurse, injured her right shoulder at work when a patient yanked her arm. The Veteran denied any prior injury to the right shoulder. Thereafter, in March 1998, the Veteran underwent surgery to repair the right rotator cuff. In August 2004, while performing a period of ACDUTRA, the Veteran reported right shoulder pain after doing push-ups, and she was diagnosed with a right shoulder strain. 

In such a case, the rating assigned will reflect only the degree of disability over and above the degree existing at the time of entrance into active service, and it is thus necessary to deduct from the present degree of disability the degree, if ascertainable, of the disability existing at the time of entrance into active service. 38 C.F.R. § 4.22 (2015).

Here, the RO justified the 10 percent reduction based upon a finding that the pre-service evidence showed "mild intermittent pain on rare occasions without limitation of motion." 

On further review, the Board finds the reduction in rating in this case was improper. 

The evidence from prior to Veteran's August 2004 period of ACDUTRA shows that after the Veteran's March 1998 surgery, she periodically complained of right shoulder pain, but she had full shoulder range of motion. See, e.g., March 1999 Private Treatment Record; April 2002 Private Treatment Record. 

In May 2006, the Veteran underwent a VA examination. She reported that following her 1998 surgery, her right shoulder symptoms improved, and she had minimal pain and minimal residual problems. The examiner opined that the Veteran's "baseline right shoulder condition following recovery from surgery was mild intermittent pain on rare occasions without limitation of ROM. Her aggravated condition due to military service was more frequent pain which limited her range of motion during flareups." 

This evidence does not support a compensable rating under any diagnostic code pertaining to the shoulder, particularly the observation of the May 2006 VA examiner that the Veteran simply suffered from mild intermittent pain and no limitation of motion prior to aggravation. 

The Board recognizes that the Court, in DeLuca v. Brown, 8 Vet. App. 202 (1995), held that, where evaluation is based on limitation of motion, the question of whether pain and functional loss are additionally disabling must be considered. 38 C.F.R. §§ 4.40, 4.45. However, the Court also held that § 4.40 does not require a separate rating for pain but rather provides guidance for determining ratings under other diagnostic codes assessing musculoskeletal function. See Spurgeon v. Brown, 10 Vet. App. 194 (1997). 

Here, the evidence does not support a compensable rating due to functional loss caused by pain. There is no indication that the Veteran's right shoulder disability picture warranted a compensable evaluation under any diagnostic code pertaining to the shoulder because of pain or weakness.

In short, a right shoulder disability that was 10 percent disabling was not demonstrated prior to the Veteran's period of ACDUTRA. The VA regulatory provisions for subtracting the degree of pre-existing disability are not applicable in this case, and the reduction was improper. See 38 C.F.R. § 4.22. Accordingly, a 30 percent rating is assigned from the effective date of service connection. 

B. Disability Rating for the Right Shoulder

Turning now to the evidence of record since the grant of service connection, the Veteran underwent a VA examination in May 2006. The Veteran reported intermittent weakness, stiffness, fatigability, lack of endurance, and instability in her right shoulder. She rated the pain at 8 out of 10. She indicated that her shoulder condition is aggravated by lifting, weather, and overuse, and improved by rest and medication. She reported that during flare-ups, her pain level is 10/10. She indicated that she is very careful regarding her shoulder and reluctant to move it because of pain and fear of subluxation.

On examination, range of motion testing revealed forward flexion to 110 degrees, extension to 30 degrees, abduction to 110 degrees, external rotation to 45 degrees, and internal rotation to 20 degrees. The Veteran grimaced and complained of pain with all movements. Passive range of motion and range of motion after repetitive use testing were unchanged. Strength for right shoulder movement was 4/5 due to pain. There was diffuse tenderness to palpation over the lateral and anterior right shoulder. The Veteran demonstrated that during a flare-up, the range of motion for her right shoulder is additionally limited to 45 degrees of abduction due to pain. She reported that when her shoulder is flared up, she literally does not move it away from her side, but holds it next to her body with her other arm. X-rays showed mild glenohumeral joint osteoarthrosis. 

A December 2006 worker's compensation examination shows that the Veteran reported a chronically painful right shoulder. On examination, there was mild atrophy of the shoulder girdle musculature and positive impingement sign. There was no subluxation or laxity. Range of motion testing revealed forward flexion to 110 degrees, extension to 20 degrees, abduction to 95 degrees, external rotation to 45 degrees, and internal rotation to 45 degrees. There was evidence of crepitus, pain, and weakness with shoulder motion. 

Subsequent private treatment records show continuing complaints of right shoulder pain and weakness and range of motion of 90 degrees of forward elevation (flexion).

In August 2010, the Veteran underwent a right shoulder arthroscopy. 

A November 2010 private physical therapy record shows that the Veteran had 97 degrees of flexion and 70 degrees of abduction.

A February 2011 private treatment record shows that the Veteran reported right shoulder pain. On examination, she had 120 degrees of forward flexion and 4/5 muscle strength. A June 2011 private treatment record shows that the Veteran reported pain and a slipping sensation. On examination, she had 80 degrees of flexion. 

The Veteran was afforded a VA examination in July 2011. The Veteran reported chronic pain, weakness, and stiffness of her right shoulder. She indicated that the pain is made worse with pushing, pulling, overhead movements, weather changes and dampness. She indicated that there were no restrictions with her employment as a nurse, but she reported that any type of hanging of IVs or moving of patients will aggravate her right shoulder. 

On examination, there was atrophy of the anterior, posterior, and lateral deltoid muscles. No instability was noted. Range of motion testing showed flexion to 95 degrees with pain at 80 degrees, abduction to 80 degrees with pain at 70 degrees, external rotation to 10 degrees with pain throughout, and internal rotation to 50 degrees with pain throughout. Range of motion testing was done actively and passively. There was no change in range of motion after repetition, but there was increased pain. The Veteran reported no flare-ups of pain. 

A December 2011 private treatment record shows that the Veteran was working full-time as a nurse. She reported pain and weakness. On examination, active range of motion was 95 degrees of flexion, and passive range of motion was 110 degrees of flexion. There was evidence of atrophy.

An August 2012 private treatment record shows that the Veteran was working full-time as a nurse. On examination, she had 140 degrees of flexion. 

A December 2013 private treatment record shows that the Veteran reported increasing pain. On examination, she had 120 degrees of flexion.

A June 2014 private treatment record shows 120 degrees of flexion.

In an August 2014 statement, the Veteran reported that her right shoulder symptoms were worsening. 

A September 2014 private treatment record shows that the Veteran was given ten days off of work due to her right shoulder disability. The physician indicated that she had the following restrictions: no work, lifting, pushing, pulling, reaching, prolonged standing. 

A November 2014 private treatment record shows that the Veteran reported right shoulder pain. On examination, the Veteran had limited range of motion. The diagnosis was right shoulder pain/strain/sprain/recurrent subluxation and rule out ankylosis. She was given nine days off of work. 

A February 2015 private treatment record shows that the Veteran was seen for right shoulder pain and recurrent dislocations/subluxations. On examination, the physician noted a flare-up due to right shoulder spasm and stiffness. Range of motion testing revealed abduction of 20 to 25 degrees from the side, and the physician noted that she was "unable to do much ROM testing" due to pain of 8/10. There was also evidence of instability and frequent subluxation. The physician also noted a "frozen shoulder." The physician indicated that the Veteran "may need total shoulder replacement." 

In February 2015, the Veteran's private physician completed a Shoulder and Arm Conditions Disability Questionnaire. The physician provided the following diagnoses related to the Veteran's right shoulder: shoulder strain, shoulder impingement syndrome, rotator cuff tendonitis; rotator cuff tear; labral tear; glenohumeral joint osteoarthritis; ankylosis of glenohumeral articulations (shoulder joint); and glenohumeral joint instability. The physician indicated that the Veteran has flare-ups of her condition resulting in functional loss. Specifically, the Veteran has to take periodic time off or perform light duty during flare-ups. The physician also reported that the condition is getting more problematic. 

The physician indicated that the Veteran was not able to perform range of motion testing due to a flare-up of pain, subluxation, muscle spasm, much guarding, and apprehension. The physician opined that the Veteran's limited range of motion contributes to functional loss in that it impacts the Veteran's ability to work, but does not totally incapacitate her from working, and that it affects her activities of daily living. The physician also opined that the Veteran may be totally incapacitated during flare-ups. Regarding functional loss, the physician indicated that the following factors resulted in additional functional loss: less movement than normal, excess fatigability, incoordination, pain on movement, instability of station, disturbances of locomotion, interference with sitting, interference with standing, and interference with sleeping. The physician opined that pain, weakness, fatigability, or incoordination significantly limited functional ability during flare-ups or when the joint is used repeatedly over a period of time. The physician estimated that the Veteran's range of motion during flare-ups or with repeated loss was 25 to 40 degrees, or less, of abduction. The physician opined that weakness, pain, and an inability to handle items, lift, or perform activities of daily living were contributing factors of the disability no associated with limitation of motion. 

The physician reported that muscle strength testing was not conducted, but that muscle strength was reduced due to recurrent work and activity, repeated flare-ups, and subluxation. There was no evidence of atrophy. The physician indicated that the Veteran had ankylosis in abduction between favorable and unfavorable (intermediate ankylosis) and "sometimes" during flare-ups ankylosis in abduction at 25 degrees or less from the side (unfavorable ankylosis). The physician noted that the veteran had episodic frozen shoulder and muscle spasms. The physician noted a history of mechanical symptoms, such as clicking and catching, and indicated that the Veteran had a history of recurrent dislocation with frequent episodes and guarding of all arm movement. The physician reported that the Veteran did not have impairment of the humerus, to include loss of head, nonunion, or fibrous union of the humerus, or malunion of the humerus. 

In a February 2015 letter accompanying the Shoulder and Arm Conditions Disability Questionnaire, the Veteran's physician reported that the Veteran had significant pain and discomfort to her right shoulder with muscle spasm and weakness. He indicated that the Veteran's ability to abduct is 25-40 degrees at best, depending on the severity of the exacerbation. He reported that there is notable guarding at all times, almost to the point of a frozen shoulder, and that the Veteran has many flare-ups due to the repetitiveness of her job, which involves much overhead reach, pushing, pulling, and lifting. He indicated that the Veteran continues to require time off from her job due to exacerbations and that light duty still causes much aggravation during flare-ups. He reported that reducing hours and decreasing number of days "helped in the past, but it is becoming hard to manage." 

A June 2015 VA treatment record shows that the Veteran reported constant pain. On examination, active range of motion testing showed flexion to 80 degrees and abduction to 75 degrees, and passive range of motion was "significantly less due to guarding." 

Diagnostic Codes 5200 through 5203 address disability ratings for the shoulder and arm. The Veteran's right shoulder disability is evaluated under the criteria for a major extremity because competent medical evidence of record reflects that she is right-handed. See 38 C.F.R. § 4.69.

Diagnostic Code 5200 provides for the evaluation of a shoulder or arm disability if there is ankylosis of the scapulohumeral articulation. 38 C.F.R. § 4.71a. A 30 percent rating is warranted for favorable ankylosis of the major scapulohumeral articulation (abduction to 60 degrees, can reach mouth and head). A 40 percent rating is warranted for intermediate ankylosis of the major scapulohumeral articulation (between favorable and unfavorable). A 50 percent rating is warranted for unfavorable ankylosis of the major scapulohumeral articulation (abduction limited to 25 degrees from the side).

Diagnostic Code 5201 provides that limitation of motion of the major arm at shoulder level is rated as 20 percent; limitation of motion of the major arm to midway between the side and shoulder level is rated as 30 percent; and limitation of motion of the major arm to 25 degrees from the side is rated as 40 percent. 

With respect to the major arm, Diagnostic Code 5202 provides that impairment of the humerus is rated as 20 percent with recurrent dislocation of the scapulohumeral joint with infrequent episodes and guarding of movement only at shoulder level; impairment of the humerus is rated as 30 percent with recurrent dislocation of the scapulohumeral joint with frequent episodes and guarding of all arm movements; impairment of the humerus is rated as 50 percent with fibrous union; impairment of the humerus is rated as 60 percent with nonunion (false flail joint); and impairment of the humerus is rated as 80 percent with loss of head (flail shoulder). 

Under Diagnostic Code 5203, a 20 percent evaluation, the maximum available under this section, is assignable for dislocation of the clavicle or scapula, or nonunion with loose movement. This code also allows that alternatively, the disability may be rated on impairment of function of the contiguous joint. 

Diagnostic Code 5010 provides that arthritis due to trauma that is substantiated by x-ray findings is to be rated as degenerative arthritis. Diagnostic Code 5003 provides that degenerative arthritis that is established by x-ray findings will be rated on the basis of limitation of motion under the appropriate diagnostic codes for the specific joint or joints involved. 38 C.F.R. § 4.71a.

38 C.F.R. § 4.71, Plate I, defines normal ranges of motion of the shoulder. Normal ranges of motion of the shoulder are flexion (forward elevation) from 0 degrees to 180 degrees, abduction from 0 degrees to 180 degrees, external rotation from 0 degrees to 90 degrees, and internal rotation from 0 degrees to 90 degrees. 38 C.F.R. § 4.71, Plate I. In determining whether the Veteran has limitation of motion to shoulder level, it is necessary to consider forward flexion and abduction. See Mariano v. Principi, 17 Vet. App. 305, 314-16 (2003).

When evaluating musculoskeletal disabilities, VA may, in addition to applying schedular criteria, consider granting a higher rating in cases in which the claimant experiences additional functional loss due to pain, weakness, excess fatigability, or incoordination, to include with repeated use during flare-ups, and those factors are not contemplated in the relevant rating criteria. See 38 C.F.R. §§ 4.40, 4.45; DeLuca v. Brown, 8 Vet. App. 202, 204-7 (1995). The provisions of 38 C.F.R. §§ 4.40 and 4.45 are to be considered in conjunction with the diagnostic codes predicated on limitation of motion. See Johnson v. Brown, 9 Vet. App. 7 (1996).

Having carefully considered the Veteran's contentions in light of the evidence recorded and the applicable law, the Board finds that prior to September 9, 2014, the Veteran's right shoulder disability was properly evaluated as 30 disabling. Resolving all reasonable doubt in favor of the Veteran, prior to September 9, 2014, the Veteran's right shoulder disability was manifested, at worst, by limitation of motion of the arm to midway between side and shoulder level, which warrants a 30 percent rating under Diagnostic Code 5201. Although the evidence from this period generally shows flexion and abduction limited to 90 degrees (at shoulder level), or better; taking into account the Veteran's functional impairment due to pain, weakness, and guarding, the Veteran's limitation of motion of the arm most nearly approximated limitation to between side and shoulder level prior to September 9, 2014.

Additionally, for the entire appeal period, the Veteran's right shoulder disability was productive of frequent episodes of recurrent dislocation and guarding of all arm movement, which warrants a 30 percent rating under Diagnostic Code 5202. However, because this rating is the same as the rating warranted under Diagnostic Code 5201, rating the Veteran under Diagnostic Code 5202 would not be more advantageous to the Veteran. 

Moreover, prior to September 9, 2014, the evidence in this case shows that the 30 rating assigned appropriately compensates the Veteran to the extent that she does have functional loss due to limited or excess movement, pain, weakness, excess fatigability, and/or incoordination. See 38 C.F.R. §§ 4.40 and 4.4; DeLuca. The Board accepts that the Veteran experienced shoulder symptomatology, especially pain, weakness, and instability, prior to September 9, 2014. See 38 C.F.R. §§ 4.40, 4.45. However, the Board believes that the 30 percent disability evaluation contemplates the degree of pain and functional impairment for the right shoulder. The evidence during this period clearly reflects that the Veteran's range of motion was affected by some pain and instability; however, she was still able to consistently accomplish right shoulder range of motion as noted above (i.e., flexion and abduction to, at worst, 80 degrees, or to almost shoulder level). Further, the majority of the right shoulder range of motion values were significantly higher than 90 degrees, or shoulder level, during this period. Additionally, the record reflects that the Veteran worked full-time as a nurse, without restrictions, during this period. 

The Board has also considered whether entitlement to a higher evaluation is warranted under any other applicable Diagnostic Code prior to September 9, 2014. An evaluation in excess of 30 percent is not warranted under Diagnostic Codes 5200 or 5202 prior to September 9, 2014, because there is no evidence of ankylosis of the scapulohumeral articulation; or other impairment of the humerus, involving malunion, fibrous union, non-union, or loss of head; or impairment of the clavicle or scapula. 

The Board also notes that separate ratings are not available under Diagnostic Codes 5201 and 5202 as they both contemplate limitation of motion (described as guarding in DC 5202), and separate ratings would violate the anti-pyramiding provisions of 38 C.F.R. § 4.14. Additionally, the Veteran's rating under DC 5201, prior to September 9, 2014, encompasses her entire shoulder disability, including the evidence of pain, guarding, and recurrent dislocations. As such, separate ratings under DCs 5201 and 5202 would improperly constitute ratings for duplicative or overlapping symptomatology. Similarly, the Board acknowledges a diagnosis of arthritis of the right shoulder established by x-ray findings as of May 2006, but finds that a separate rating for arthritis (degenerative disease) is not warranted under DC 5003 or 5010, because the Veteran is already in receipt of a compensable rating for limitation of motion of the joint.

However, since September 9, 2014, the Board finds that the Veteran's right shoulder disability has been manifested by frequent episodes of dislocation with severe pain, guarding, and limited range of motion that most nearly approximates limitation in motion to 25 degrees from the side, considering additional functional impairment due to pain, weakness, extreme guarding, and difficulty with repetitive motion. 

In this regard, a September 9, 2014 private treatment note indicates that the Veteran's was given ten days off of work due to her right shoulder disability. Thereafter, a February 2015 private treatment record shows abduction of 20 to 25 degrees from the side, and the physician noted that the Veteran was "unable to do much ROM testing" due to pain. Additionally, the Veteran's private physician reported in the February 2015 examination report that the Veteran's condition, which had become more problematic, limited and impacted her ability to work. The physician additionally described significant functional impacts of the Veteran's right shoulder disability. Similarly, although a June 2015 VA treatment record shows active range of motion of 80 degrees of flexion and 75 degrees of abduction, the Veteran's passive range of motion was "significantly less due to guarding." 

The above evidence, including the Veteran's competent lay statements, reflect that, since September 9, 2014, pain, weakness, extreme guarding, and difficulty with repetitive motion cause the Veteran significantly reduced ability to use her arm for reaching, pulling, pushing or lifting, or to raise her arm. This evidence thus reflects that the Veteran's symptoms more nearly approximate the limitation of motion to 25 degrees from the side that warrants a 40 percent rating for the right arm under DC 5201. See 38 C.F.R. §§ 4.10, 4.40, 4.45; DeLuca v. Brown, 8 Vet. App. 202 (1995). This is the maximum rating available under DC 5201.

The Board has considered whether a higher rating is appropriate at any point under an analogous diagnostic code. There are no higher ratings available under Diagnostic Code 5203. To warrant a higher rating under Diagnostic code 5202, shoulder dislocations must manifest as fibrous union of the humerus, nonunion of the humerus, or loss of head of the humerus, which is not demonstrated in this case, even taking into account the Veteran's functional impairments due to pain and guarding. See February 2015 Private DBQ. 

A higher rating would also be warranted under Diagnostic Code 5200 for unfavorable ankylosis, which is not demonstrated in this case. In this regard, the Board acknowledges the February 2015 private physician's notation that the Veteran had unfavorable ankylosis. However, every treatment record prior and subsequent to this notation reflects that the Veteran maintained some range of motion of her right arm. Moreover, contrary to the February 2015 DBQ, the February 2015 private treatment record authored by the same physician shows that the Veteran was able to abduct her arm 20 to 25 degrees from the side. Thus, while functional impairment associated with the disability may be analogous with ankylosis, given that the Veteran continues to have some range of motion in her right shoulder despite her complaints of pain and guarding, this "ankylosis-like" impairment is more closely analogous to favorable ankylosis which limited to between 60 degrees and 25 degrees than unfavorable ankylosis limited to 25 degrees from the side, which would be required for a higher, 50 percent rating. 

As noted above, separate ratings are not available under Diagnostic Codes 5201 and 5202 or 5003 as they all contemplate limitation of motion (described as guarding in DC 5202), and separate ratings would violate the anti-pyramiding provisions of 38 C.F.R. § 4.14. For the same reasons, separate ratings under 5201 and 5200 are not available. 

The Board has also considered whether the Veteran's disability would support a higher evaluation under consideration for muscle injury based on evidence of impairment, including weakness and atrophy, of the deltoid muscles. See July 2011 VA Examination Report; February 2015 Private Examination Report. In this regard, Diagnostic Code 5303, for Muscle Group III, which relates to the deltoid muscle, involves elevation and abduction of the arm to should level. However, Diagnostic Code 5303 does not provide for an evaluation in excess of 40 percent due to injury to Muscle Group III. 38 C.F.R. § 4.73, Diagnostic Code 5304.

Moreover, the Board finds that the assignment of a separate rating based on muscle group involvement would involve impermissible pyramiding in this case because the 40 percent rating assigned herein encompasses the Veteran's entire shoulder disability, including evidence of weakness and limitation of abduction. In this regard, disability of a muscle group is based on impaired joint motion and its ability to perform its full work. 38 C.F.R. § 4.73. As such, separate ratings would improperly constitute ratings for duplicative or overlapping symptomatology.

The Board concludes that the objective medical evidence and the Veteran's statements regarding her symptomatology show disability that most nearly approximates that which warrants the assignment of a 30 percent disability rating prior to September 9, 2014, and a 40 percent disability rating after September 9, 2014. See 38 C.F.R. § 4.7. As shown above, and as required by Schafrath, the Board has considered all potentially applicable provisions of 38 C.F.R. Parts 3 and 4, whether or not they have been raised by the Veteran. The Board finds no provision upon which to assign a greater or separate rating.

The Board also has considered whether the Veteran is entitled to a greater level of compensation on an extraschedular basis. Ordinarily, the VA Schedule will apply unless there are exceptional or unusual factors which would render application of the schedule impractical. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993).

According to the regulation, an extraschedular disability rating is warranted based upon a finding that the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that would render impractical the application of the regular schedular standards. See 38 C.F.R. § 3.321(b)(1) (2015). An exceptional case is said to include such factors as marked interference with employment or frequent periods of hospitalization as to render impracticable the application of the regular schedular standards. See Fanning v. Brown, 4 Vet. App. 225, 229 (1993).

Under Thun v. Peake, 22 Vet App 111 (2008), there is a three-step inquiry for determining whether a Veteran is entitled to an extraschedular rating. First, the Board must determine whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Second, if the schedular evaluation does not contemplate the Veteran's level of disability and symptomatology and is found inadequate, the Board must determine whether the Veteran's disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a Veteran's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the Veteran's disability picture requires the assignment of an extraschedular rating.

As discussed in detail previously, the Veteran's symptomatology is fully addressed by the rating criteria under which arm and shoulder disabilities are rated. There are no additional symptoms that are not addressed by the rating schedule. The Veteran has not described any exceptional or unusual features of her right shoulder disability. In fact, as discussed above, the symptomatology of the Veteran's disability centers on her complaints of painful and limited range of motion and recurrent dislocations. These symptoms are specifically contemplated under the assigned ratings criteria. Therefore, the Board finds that the rating criteria reasonably describe the Veteran's disability level and symptomatology for her service-connected shoulder disability. As such, the Board finds that the rating schedule is adequate to evaluate the Veteran's disability picture. Consequently, the Board concludes that referral of this case for consideration of an extra-schedular rating is not warranted. Id.; Bagwell v. Brown, 9 Vet. App. 337, 338-39 (1996); Floyd v. Brown, 9 Vet. App. 88, 96 (1996).

The Board also notes that under Johnson v. McDonald, 762 F.3d 1362 (2014), a Veteran may be awarded an extraschedular rating based upon the combined effect of multiple disorders in an exceptional circumstance where the evaluation of the individual entities fails to capture all the service-connected disabilities experienced. In this case, the Veteran's symptoms and manifestations are addressed by the appropriate diagnostic codes. See Mittleider v. West, 11 Vet. App. 181 (1998). Accordingly, this is not a case involving an exceptional circumstance in which extraschedular consideration may be required to compensate the Veteran for a disability that can be attributed only to the combined effect of multiple entities.

Lastly, a request for a total disability rating based on individual unemployability due to service-connected disability (TDIU), whether expressly raised by a claimant or reasonably raised by the record, is an attempt to obtain an appropriate rating for disability or disabilities, and is part of a claim for increased compensation. There must be cogent evidence of unemployability in the record. Rice v. Shinseki, 22 Vet. App. 447 (2009) (citing Comer v. Peake, 552 F.3d 1362 (Fed. Cir. 2009)). However, the holding of Rice is inapplicable here because the evidence of record does not illustrate that the Veteran's service-connected right shoulder disability prevents her from obtaining and/or maintaining gainful employment; nor has the Veteran so contended. The record reflects that the Veteran has maintained employment as a nurse throughout the pendency of the appeal. At this point, therefore, there is no cogent evidence of unemployability and the issue of entitlement to a TDIU need not be addressed further.

ORDER

Entitlement to a disability rating of 30 percent, but no higher, for a right rotator cuff tear and repair with osteoarthritis, prior to September 9, 2014, is granted, subject to the law and regulations governing the criteria for award of monetary benefits.

Entitlement to a disability rating of 40 percent, but no higher, for a right rotator cuff tear and repair with osteoarthritis, since September 9, 2014, is granted, subject to the law and regulations governing the criteria for award of monetary benefits.

REMAND

After a careful review of the Veteran's claims file the Board finds that further development is required prior to adjudicating the remaining issues on appeal. 

The Veteran contends that her cervical spine condition and right hand CTS are secondary to her service-connected right shoulder disability. Alternatively, the Veteran asserts that her activities during ACDUTRA and INACDUTRA permanently aggravated the residuals of her cervical spine and right hand conditions. See April 2015 Written Brief Presentation. 

In the May 2015 remand, the Board found that VA opinions obtained in May 2012 were inadequate and remanded the case for further opinions supported by adequate rationales.

In February 2016, the Veteran was afforded a VA Cervical Spine Conditions examination. The Veteran reported that her neck pain began in 1994 around the same period of time that she injured her right shoulder. She denied any specific injury to her neck. 

The examiner opined that it is less likely as not that the Veteran's cervical spine disability was incurred in or is otherwise related to the Veteran's service. The examiner noted an initial September 20, 1996, diagnosis of invertebral disc syndrome in the Veteran's private treatment records. The examiner also noted that the service treatment records do not document any specific neck injury or event in service related to a neck condition. However, the examiner indicated that "if the regional office determines that the Veteran was on active duty status on Sept 20, 1996, this examiner would reconsider his opinion and opine that the cervical spine disability was incurred in active service because this condition was diagnosed on that date." 

The Board finds that this opinion is inadequate as it was based upon a mere lack of medical evidence in the service treatment records. Relying on the absence of evidence in medical records to provide a negative opinion is contrary to established case law, and such opinions are therefore inadequate. See Dalton v. Nicholson, 21 Vet. App. 23 (2007). The examiner did not address the Veteran's lay statements that her duties during ACDUTRA and INACDUTRA worsened her disabilities. 

Regarding secondary service connection, the examiner opined that it is less likely than not that the Veteran's cervical spine disability is caused by her service connected shoulder disability or is aggravated by her service connected shoulder disability. The examiner's rationale was that "[t]here is no supporting evidence in the medical literature that shoulder conditions cause cervical disc disease" and that "[t]here is no medical evidence that the Veteran's shoulder condition aggravated her cervical spine condition." 

The Board finds that the opinion is inadequate as there was no adequate rationale given for the opinion. The mere statement by the examiner that there was "no medical evidence that the Veteran's shoulder condition aggravated her cervical spine condition" is wholly conclusory and renders that opinion inadequate for adjudication purposes. See Stefl v. Nicholson, 21 Vet. App. 120, 124 (2007) ("[A] medical opinion ... must support its conclusion with an analysis that the Board can consider and weigh against contrary opinions."). 

As the February 2016 VA opinion does not comply with the Board's remand directives, the Board must again return the Veteran's claims file for a new opinion. Stegall v. West, 11 Vet. App. 268 (1998) (holding that RO compliance with remand directives is not optional or discretionary and the Board errs as a matter of law when it fails to ensure remand compliance).

Also in February 2016, the Veteran was afforded a VA Peripheral Nerves Conditions examination. She reported that she developed numbness/tingling in her right hand around the same time that she injured her shoulder in 1994. 

The examiner opined that it is less likely as not that the Veteran's right hand carpal tunnel syndrome was incurred in or is otherwise related to the Veteran's service because "[t]here is no medical evidence that any event during active service caused her to develop right hand carpal tunnel syndrome." 

The Board finds that this opinion is inadequate as it was based upon a mere lack of medical evidence in the service treatment records. Relying on the absence of evidence in medical records to provide a negative opinion is contrary to established case law, and such opinions are therefore inadequate. See Dalton v. Nicholson, 21 Vet. App. 23 (2007). The examiner did not address the Veteran's lay statements that her duties during ACDUTRA and INACDUTRA worsened her disabilities.

Regarding secondary service connection, the examiner opined that it is less likely than not that the Veteran's right hand carpal tunnel syndrome was caused by her service connected shoulder disability or was aggravated by her service connected shoulder disability. The examiner's rationale was that "[t]he medical literature does not support the contention that shoulder conditions cause carpal tunnel syndrome and there is no medical evidence that the Veteran's shoulder condition aggravated her carpal tunnel syndrome."

The Board finds that the opinion is inadequate as there was no adequate rationale given for the opinion. The mere statement by the examiner that there was "no medical evidence that the Veteran's shoulder condition aggravated her carpal tunnel syndrome" is wholly conclusory and renders that opinion inadequate for adjudication purposes. See Stefl v. Nicholson, 21 Vet. App. 120, 124 (2007) ("[A] medical opinion ... must support its conclusion with an analysis that the Board can consider and weigh against contrary opinions."). 

As the February 2016 VA opinion does not comply with the Board's remand directives, the Board must again return the Veteran's claims file for a new opinion. Stegall v. West, 11 Vet. App. 268 (1998) (holding that RO compliance with remand directives is not optional or discretionary and the Board errs as a matter of law when it fails to ensure remand compliance).

The RO/AMC should also obtain and review any outstanding VA and private treatment records. 38 U.S.C.A. § 5103A(c) (West 2014); see also Bell v. Derwinski, 2 Vet. App. 611 (1992) (VA medical records are in constructive possession of the agency, and must be obtained if the material could be determinative of the claim).

Accordingly, the case is REMANDED for the following action:

1. Obtain and associate with the Veteran's claims file all outstanding VA treatment records documenting treatment for the conditions on appeal dated from October 2015 to the present. The Veteran should also be afforded the opportunity to identify and submit any outstanding private treatment records.

2. After all available records have been associated with the claims file, obtain a VA medical opinion to determine the etiology of the Veteran's cervical spine condition and right hand carpal tunnel syndrome. The need for another examination is left to the discretion of the medical professional offering the addendum opinion. The entire claims file and a copy of this Remand must be made available to the reviewing examiner and the examiner shall indicate in the report that the claims file was reviewed. 

After reviewing the claims file, and if necessary examining the Veteran, the examiner should address the following:

(a) Offer an opinion as to whether it is at least as likely as not (i.e. 50 percent or greater probability) that the Veteran's diagnosed cervical spine condition and right hand carpal tunnel syndrome was aggravated by the Veteran's activities and duties of ACDUTRA or INACDUTRA service in the Army Reserves after the 1994 shoulder injury. 

In providing this opinion, the examiner is asked to consider, and comment on, the service treatment records; private treatment records; an April 2007 letter from the Veteran's private physician; and the Veteran's statements with treatise evidence submitted in April 2015. If necessary, and to the extent possible, the examiner should reconcile his or her opinion with this evidence. 

(b) Regardless of the response to question (a), offer an opinion as to whether it is at least as likely as not (i.e. 50 percent or greater probability) that cervical spine condition and right hand carpal tunnel syndrome are (i) caused or (ii) aggravated (permanently increased in severity beyond the normal progression of the disorder) by the Veteran's service-connected right shoulder disability.

The examiner's report must reflect consideration of the Veteran's entire documented medical history and assertions and all lay evidence. A fully articulated medical rationale for any opinion expressed must be set forth in the medical report. The examiner should discuss the particulars of this Veteran's history and the relevant medical science as applicable to this case, which may reasonably explain the medical guidance in the study of this case. If the examiner is unable to provide an opinion without resort to speculation, he or she should explain why this is so and what, if any, additional evidence would be necessary before an opinion could be rendered.

3. Thereafter, the AOJ must review the claims file to ensure that the foregoing requested development has been completed. In particular, review the requested medical opinions to ensure that they are responsive to and in compliance with the directives of this remand and if not, implement corrective procedures. See Stegall v. West, 11 Vet. App. 268 (1998).

4. Following the completion of the foregoing, the RO/AMC should readjudicate the Veteran's claim. If the claim is denied, supply the Veteran and her representative with a supplemental statement of the case and allow an appropriate period of time for response. Thereafter, the claims folder should be returned to the Board for further appellate review, if otherwise in order.

The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).

______________________________________________
WAYNE M. BRAEUER
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs